IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-29564 MER |
| MARK A. KENDALL, ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| ) | |
| CHARLES SCHLOSSER, CHAPTER 7 ) | Adversary No. 10-1710 MER |
| TRUSTEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JANET K. KENDALL, and THE J. K. ) | |
| FAMILY TRUST ) | |
| ) | Signed/Docketed |
| Defendants. ) | August 6, 2012 |

## ORDER

THIS MATTER comes before the Court on the *Complaint for Avoidance of Fraudulent Transfers and Related Relief*[1] ("Complaint") filed by Plaintiff Charles Schlosser ("Trustee"), Chapter 7 Trustee for the bankruptcy estate of Debtor Mark A. Kendall ("Debtor"). The Trustee seeks to recover, as fraudulent transfers, the Debtor's transfer of assets to his wife, Janet K. Kendall ("J. Kendall"), and her transfer of assets to The J.K. Family Trust ("Trust"). The issues before the Court concern the Debtor's intent and the Debtor's financial condition at the time the transfers were made.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(E) and (H), as it involves a request to turn over alleged property of the estate, and the recovery of fraudulent conveyances.

---

[1] Docket No. 1.

**BACKGROUND FACTS**

The Debtor filed a voluntary proceeding under Chapter 7 of Title 11 of the United States Code on August 2, 2010 ("Petition Date"). On September 30, 2010, the Trustee commenced this adversary proceeding by filing his Complaint against J. Kendall and the Trust (collectively, the "Defendants"). J. Kendall formed the Trust on February 19, 2010 under the laws of the Cook Islands.[2] J. Kendall is the Debtor's spouse, and the beneficiary of the Trust.[3] Kathe Mizer ("Mizer") is J. Kendall's mother, and the trustee of the Trust.[4] Mizer loaned funds to Debtor to pay for Debtor's bankruptcy counsel, and her loan was secured by an interest in Debtor's state and federal tax refunds.[5]

In 1984, the Debtor formed a wholly owned printing company, Kendall Printing Company ("KPC").[6] According to the parties, the Debtor also manages and owns 82.4% of another entity, Kendall Land Company ("KLC").[7] New Frontier Bank ("New Frontier") made two loans to the Debtor personally and four loans to KPC.[8] Specifically, on December 16, 2005, the Debtor borrowed $675,000 from New Frontier.[9] On December 28, 2005, KPC borrowed $325,212 from New Frontier.[10] On April 21, 2006, the Debtor borrowed an additional $1,500,000 from New Frontier to finance the building in which KPC was located.[11] On April 27, 2006, KPC obtained two more loans from New Frontier, in the amounts of $245,000 and $3,854,690.[12] In January 2008, KPC

---

[2] Joint Pretrial Statement ("JPS"), Docket No. 60, at ¶ 4-5. The majority of facts in this case are uncontested.

[3] JPS, at ¶¶ 3, 6.

[4] JPS, at ¶¶ 7-8.

[5] JPS, at ¶ 9.

[6] JPS, at ¶¶ 38-39.

[7] JPS, at ¶¶ 13-14.

[8] JPS, at ¶¶ 41-57. According to the parties, the loans were modified from time to time between the Debtor, KPC and New Frontier.

[9] JPS, at ¶¶ 42-44. *See also* Trustee's Exhibits 7–9, promissory note and modification agreements.

[10] JPS, at ¶¶ 47-46. *See also* Trustee's Exhibits 11–13, promissory note and modification agreements.

[11] JPS, at ¶¶ 45-46. *See also* Trustee's Exhibit 10.

[12] JPS, at ¶¶ 50-55. *See also* Trustee's Exhibits 15–24, promissory notes and modification agreements.

obtained an $800,000 line of credit from New Frontier.[13] The Debtor personally guaranteed the four loans to KPC.[14]

On December 30, 2008, the Debtor issued a cashier's check in the amount of $125,000 payable to J. Kendall (the "First Cash Transfer").[15] J. Kendall gave no consideration for the First Cash Transfer.[16]

In February 2009, the Debtor and KPC requested New Frontier restructure all loans. On April 10, 2009, New Frontier was closed and the FDIC appointed a receiver.[17] In late 2009, the FDIC sold the loans held by New Frontier to Summit Bridge Credit Investments, LLC ("Summit"), the current holder of the loans.[18] Summit commenced state court collection proceedings against the Debtor and KPC in November 2009, and the Debtor closed KPC the same month.[19]

J. Kendall was aware of Summit's legal actions, including its attempt to attach the Debtor's assets.[20] On November 10, 2009, KLC issued a check in the amount of $210,000 to Laskin Medical LLC ("Laskin"), a company formed by J. Kendall (the "Laskin Transfer").[21] J. Kendall endorsed the check.[22] Laskin and KLC issued a promissory note classifying the Laskin Transfer as a loan from KLC to Laskin.[23] To date, Laskin has made no payments pursuant to the promissory note.[24]

---

[13] JPS, at ¶¶ 56-57. *See also* Trustee's Exhibits 26-28, loan documents and modification agreements.

[14] JPS, at ¶ 58.

[15] JPS, at ¶ 23. *See also* Trustee's Exhibit 4, cashier's check in the amount of $125,000, dated December 30, 2008.

[16] JPS, at ¶ 24.

[17] JPS, at ¶ 60. *See also* Trustee's Exhibits 26-28, loan documents and modification agreements.

[18] JPS, at ¶ 71.

[19] JPS, at ¶¶ 73-74.

[20] JPS, at ¶ 15.

[21] JPS, at ¶¶ 25, 32. *See also* Trustee's Exhibit 3, cashier's check in the amount of $210,000, dated November 11, 2009.

[22] JPS, at ¶ 28.

[23] JPS, at ¶ 26.

[24] JPS, at ¶ 27.

Prior to the Petition Date, the Debtor built a house located at 5436 W. 7th Street Road in Greely, Colorado ("House") during a previous marriage, and lived in the House when his previous marriage ended.[25] J. Kendall moved into the House in late 2006 and has lived there, with the Debtor, continuously between late 2006 and the present.[26] At the time of his March 2007 marriage to J. Kendall, the Debtor was sole-owner of the House.[27] On October 9, 2008 the Debtor transferred the House to J. Kendall for no consideration ("House Transfer"), and the House was unencumbered at that time.[28] The Trustee alleges the value of the House at the time of the House Transfer was approximately $2,000,000.

On March 24, 2010, J. Kendall recorded a warranty deed transferring the House from J. Kendall to the Trust.[29] The Trust gave no consideration for its receipt of the House.[30] J. Kendall also transferred ownership of Laskin from herself to the Trust.[31] The corpus of the Trust consists of the House, the possessions in the House and Laskin.[32]

The Trustee's First Claim for Relief in his Complaint seeks avoidance and recovery of the House Transfer, the First Cash Transfer and the Laskin Transfer as fraudulent transfers pursuant to 11 U.S.C. §§ 548 and 550.[33] The parties agree the Debtor made the House Transfer, the First Cash Transfer and the Laskin Transfer within two years before the Petition Date.[34] The parties also agree the Debtor received no consideration for the House Transfer and the First Cash Transfer.[35] The Complaint asserts these transfers occurred with the actual intent to hinder, delay, and defraud creditors, because the Debtor and/or his entities received no consideration for the

---

[25] JPS, at ¶ 16.

[26] JPS, at ¶ 17.

[27] JPS, at ¶ 18.

[28] JPS, at ¶¶ 19-20.

[29] JPS, at ¶ 21.

[30] JPS, at ¶ 22.

[31] JPS, at ¶ 33.

[32] JPS, at ¶ 11.

[33] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[34] JPS, at ¶ 29.

[35] JPS, at ¶¶ 19, 24.

transfers, and the Debtor was either insolvent on the date of the transfers, or was about to become insolvent. The Second Claim for Relief seeks avoidance and recovery of the same transfers as fraudulent transfers under §§ 544 and 550, and the Colorado Uniform Fraudulent Transfers Act ("CUFTA"), and asserts the House Transfer was concealed by the Debtor.

The Defendants' Answer[36] generally denies the allegations of the Complaint, and alleges the transfers were made for appropriate reasons. The Answer raises the following affirmative defenses: 1) the Defendants received the House for value and in good faith; 2) the Trustee lacks standing as to assets of KLC; 3) the Court lacks jurisdiction over the assets of KLC; 4) the Complaint fails to state a claim upon which relief may be granted; and 5) the claims are barred by waiver, estoppel and laches.

## DISCUSSION

The Trustee asserts his First Claim for Relief under § 548, which provides in relevant part —

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> >
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> > >
> > > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

---

[36] Docket No. 7.

> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Therefore, under § 548, a trustee may recover, within two years of a bankruptcy petition, two types of transfers: 1) a transfer made by the debtor with actual intent to defraud creditors in making the transfer ("actual" fraud); or 2) a transfer from which the debtor received less than "a reasonably equivalent value" in exchange, and was or became insolvent when the transfer was made ("constructive" fraud).[37]

Section 550(a) further provides, to the extent that a transfer is avoided under § 548, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from," among others, "the initial transferee of such transfer."[38] The Bankruptcy Code thus gives the bankruptcy trustee the ability to avoid fraudulent transfers under § 548 and to recover the value of those transfers from "initial transferees" under § 550(a)(1).

Under the Colorado law of fraudulent transfers, the Trustee's Second Claim for Relief, pursuant to § 544[39] and Colorado Uniform Fraudulent Transfers Act ("CUFTA"),

---

[37] *Wadsworth v. The Word of Life Christian Center (In re McGough)*, 467 B.R. 220, 224 (10th Cir. BAP 2012). See also *Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011), in which the Court noted:

> [I]f an insolvent debtor intentionally seeks to defraud his creditors—as when a debtor who has a huge judgment filed against him intentionally seeks to hinder recovery by transferring all of his assets to a friend—the transfer can be avoided as an actually fraudulent transfer. See 11 U.S.C. § 548(a)(1)(A). Still other transfers can be avoided as "constructively fraudulent," i.e., as fraudulent in effect, even if not in intent. Thus, if the insolvent debtor, regardless of intent, transfers his remaining assets to his friend in return for plainly inadequate consideration, that transfer can be avoided as "constructively fraudulent." *See* 11 U.S.C. § 548(a)(1)(B).

[38] 11 U.S.C. § 550(a)(1).

[39] Specifically, § 544(a)(1) provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien

raises issues regarding virtually identical to those raised by his claim under § 548. COLO. REV. STAT. § 38-8-105 provides for recovery of both actual and constructive fraudulent transfers, as follows:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

COLO. REV. STAT. § 38-8-106(1) also provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

In the instant case before the Court, the parties do not dispute the House Transfer, First Cash Transfer and Laskin Transfer each took place within two years of

---

on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists.

Thus, a bankruptcy trustee possesses the rights and powers of a hypothetical person who acquired a judicial lien on the debtor's property at the time that the bankruptcy petition was filed. He can avoid any lien inferior to his interest in an asset of the bankruptcy estate. *See In re Haberman*, 516 F.3d 1207, 1210 (10th Cir. 2008) (trustee has "the power to avoid any transfer or obligation that a hypothetical creditor with an unsatisfied judicial lien on the debtor's property could avoid under relevant state nonbankruptcy law.").

the Petition Date.[40] In addition, they do not dispute The Debtor made the House Transfer and the First Cash Transfer for no consideration.[41] With respect to Laskin Transfer, the parties agree no payments have been made by Laskin on the associated promissory note.[42] Accordingly, unless the Debtor proves a defense to the timing and lack of consideration for the transfers, the two initial criteria for both actual fraud and constructive fraud under § 548 and CUFTA have been met. Thus, the Court's focus turns to the following issues: 1) whether actual intent has been shown, 2) whether insolvency has been shown, and, 3) whether the Debtor has established any available defenses.[43]

## A.   Actual Fraud

Intent to hinder, delay, or defraud creditors is rarely admitted by a debtor. Therefore, a court may consider circumstantial evidence establishing badges of fraud.[44] Relevant factors include whether the transfer was to an insider; whether the debtor retained possession or control of the property after the transfer; concealment of the transfer; pending or threatened litigation against the debtor at the time of transfer; a transfer of substantially all of the debtor's assets; absconding by the debtor; removal or concealment of assets; reasonably equivalent value in exchange for the transfer; the debtor's insolvency at the time of the transfer; the proximity in time of the transfer to the incurrence of a substantial debt; and a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor.[45] Transfers

---

[40]   JPS, at ¶ 29.

[41]   *See* JPS, at ¶¶ 19, 22, 24.

[42]   *See* JPS, at ¶¶ 26, 27.

[43]   Such defenses would arise if the Trustee has failed to demonstrate actual fraud, leaving the Court to consider only constructive fraud, because "[t]here are no exceptions to avoidance of a transfer that a trustee establishes was made with actual fraudulent intent." *Wadsworth*, *supra*, at 224.

[44]   *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338–39 (10th Cir.1998).

[45]   *Id.* In addition, the Bankruptcy Court for the District of Delaware recently adopted similar indicators of fraud:

> A plaintiff charging a violation under Section 548(a)(1) must prove that the transferor made the transfer with the "actual intent to hinder, delay or defraud creditors." *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 386 (Bankr.E.D.Pa.1988). In determining "intent," courts look for "badges of fraud," which include: (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits; control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction.

*In re Direct Response Media, Inc.*, 466 B.R. 626, 654-55 (Bankr. D. Del. 2012).

to family members are subjected to particularly close scrutiny.⁴⁶ The relationship of the parties in conjunction with other circumstances often provides compelling evidence of fraud.⁴⁷

Similarly, the Colorado Court of Appeals recently discussed transfers made with actual fraudulent intent:

> Under the Colorado Uniform Fraudulent Transfer Act (CUFTA), §§ 38–8–101 to –112, C.R.S. 2011 section 38–8–105(1)(a), C.R.S. 2011, a debtor's transfer of property is fraudulent if made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." A "transfer" under CUFTA includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset . . . ." § 38–8–102(13), C.R.S. 2011.⁴⁸

The Colorado Court of Appeals has also recognized COLO. REV. STAT. § 38-8-105(2) provides a number of factors that may be considered in determining actual intent.⁴⁹ These factors, or "badges of fraud," are identical to those adopted by the Tenth Circuit Court of Appeals in *Taylor*.⁵⁰ "While a single badge of fraud may only

---

⁴⁶ *Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 782 (10th Cir. B.A.P. 2001) (citing *Mather v. Clancy ( In re Honey Creek Entertainment, Inc.)*, 246 B.R. 671, 686 (Bankr. E.D. Okla. 2000), *overruled on other grounds*, 37 Fed. Appx. 442 (10th Cir. June 7, 2002)).

⁴⁷ *Id.*

⁴⁸ *Board of County Com'ns of County of Park v. Park County Sportsmen's Ranch, LLP*, 271 P. 3d 562, 567 (Colo. App. 2011).

⁴⁹ *Schempp v. Lucre Management Group*, LLC, 75 P.3d 1157, 1161 (Colo. App. 2003).

⁵⁰ Specifically, COLO. REV. STAT. § 38-8-105 (2) provides:

(2) In determining actual intent under paragraph (a) of subsection (1) of this section, consideration may be given, among other factors, to whether:

    (a) The transfer or obligation was to an insider;

    (b) The debtor retained possession or control of the property transferred after the transfer;

    (c) The transfer or obligation was disclosed or concealed;

    (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (e) The transfer was of substantially all the debtor's assets;

    (f) The debtor absconded;

create suspicion of fraud, several badges of fraud considered together may infer intent to defraud."[51]

   1.   *Whether the Transfers Were to an Insider*

According to § 101(31), the term "insider" of an individual debtor includes a relative of the debtor, and a corporation of which the debtor is a director, officer, or person in control.[52] In this case, the House Transfer and the First Cash Transfer were from the Debtor to his wife J. Kendall. Likewise, the House Transfer, the First Cash Transfer and the Laskin Transfer were made to J. Kendall directly, Laskin which was controlled by J. Kendall or the Trust which J. Kendall was a beneficiary. J. Kendall is an "insider" because she is the Debtor's spouse.

The Debtor testified the First Cash Transfer to J. Kendall of $125,000 in December, 2008, and the $210,000 loan to Laskin in November, 2009, as well as the House Transfer, were made to assist J. Kendall in establishing her skin care business. The Debtor does not know if the two cash transfers were used for the business. He believed it would take approximately $750,000 to develop the skin care products J. Kendall intended to sell, but he has never seen a business plan for her business.

Further, the Debtor stated he took cash out of KPC and put it into KLC in order to make the $210,000 Laskin Transfer. Therefore, he caused the Laskin Transfer, utilizing funds from one corporation he controlled to another corporation he controlled, and then caused the second corporation to transfer funds to his insider, J. Kendall. The Court finds the Debtor's transfers of funds from KPC to KLC and ultimately to J. Kendall may be considered transfers made by the Debtor himself, acting as the alter ego of KPC and KLC.

---

   (g) The debtor removed or concealed assets;

   (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

   (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

   (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

   (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[51] *Schempp*, *supra*, 18 P.3d at 764.

[52] 11 U.S.C. § 101(31)(A)(i) and (iv).

As this Court has previously discussed:

Under Colorado law, "[a]n alter-ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.' " *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (citing *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n. 7 (Colo. 2004); *Gude v. City of Lakewood*, 636 P.2d 691, 697 (Colo. 1981)).

In determining whether to disregard the corporate fiction and treat the corporation and shareholder as alter-egos, the Colorado Supreme Court has set forth several factors. . . including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes. *In re Phillips*, 139 P.3d at 644 (citing *Leonard v. McMorris*, 63 P.3d 323, 330; *Newport Steel Corp. v. Thompson*, 757 F.Supp. 1152, 1156 (D. Colo. 1990)).

Secondarily, a court should determine whether "justice requires recognizing the substance of the relationship between the shareholder and corporation over the form because the corporate fiction was 'used to perpetrate a fraud or defeat a rightful claim.'" *Id.* Finally, the court should determine if an equitable result will be achieved by disregarding the corporate veil. *Id.*[53]

The Debtor's testimony as to the operation of KPC and KLC, and his control over and use of those entities, supports a finding KPC and KLC were alter egos of the Debtor. Thus, the Court finds the House Transfer, the First Cash Transfer and the Laskin Transfer were all made by the Debtor or his alter egos. Using the same analysis, and based on J. Kendall's testimony, the Court finds Laskin was the alter ego of J. Kendall, such that the Laskin Transfer from KLC to Laskin constituted a transfer to J. Kendall. Thus, all the transfers were made by the Debtor to an insider, and this factor weighs in favor of finding actual fraud.

   2.   *Whether the Debtor Retained Possession or Control of the Property After the Transfers*

With respect to the House Transfer, the Debtor and J. Kendall admit they both continue to live in the property. This evidence supports a finding the Debtor retained

---

[53] *In re First Assured Warranty Corporation*, 383 B.R. 502, 529 (Bankr. D. Colo. 2008)

control over the House. Conversely, both the Debtor's and J. Kendall's testimony indicated the First Cash Transfer and the Laskin Transfer were controlled by J. Kendall, and later by the Trust she created. With respect to the First Cash Transfer and the Laskin Transfer, there is no indication the Debtor retained any control over the funds. Instead, the evidence suggests J. Kendall used the funds or transferred them to the Trust. Thus, this factor weighs in favor of finding actual fraud with respect to the House Transfer, but against finding actual fraud as to the First Cash Transfer and the Laskin Transfer.

### 3. *Whether the Transfers Were Concealed*

The House Transfer appears in the Debtor's Statement of Financial Affairs, but the First Cash Transfer and the Laskin Transfer do not. As noted by the Trustee, the First Cash Transfer was not revealed until the Section 341 meeting.[54] Moreover, the Debtor admitted the February 16, 2009 financial statement he provided to New Frontier in connection with his request to restructure his loans did not reflect the House Transfer.[55] However, the Debtor also provided a personal financial statement to the FDIC after it took over New Frontier, and this statement did reflect the House Transfer.[56] In addition, Larry Seastrom, the Debtor's ex-banker from New Frontier, stated the bank never requested the House be used as collateral. The Court finds this somewhat unclear evidence supports a finding the transfers may not have been actively concealed, but that the Debtor at the least was inconsistent and inattentive in his disclosure of the transfers. Therefore, this factor weighs slightly in favor of finding actual fraud.

### 4. *Pending or Threatened Litigation Against the Debtor at the Time of the Transfers*

The Debtor testified he did not believe KPC was in financial jeopardy at the time he made the House Transfer in October, 2008. However, he conceded at the time he made the $210,000 loan to Laskin on November 10, 2009, KPC had gone out of

---

[54] *See* Trustee's Exhibit 4, Check to J. Kendall.

[55] *See* Trustee's Exhibit 35. The Debtor stated he discussed the House Transfer with a member of New Frontier's board approximately a week after the transfer, and noted the House had been on the market since 2000. Moreover, he testified two people from New Frontier lived on his block and saw the for sale sign, and one of the board members' wives was the listing agent. However, it is not clear whether Larry Seastrom, the former banker from New Frontier who testified on the Debtor's behalf, was the board member with whom the Debtor spoke. In addition, J. Kendall testified she did not meet the Debtor until 2006, and although she too expressed the desire to sell the House, it has not been shown a board member simply knowing the House continued to be for sale after the Debtor's meeting would be in any way apprised of the House Transfer for J. Kendall's benefit approximately one and one-half years after their marriage.

[56] Trustee's Exhibit 36

business. His Statement of Financial Affairs and the parties' stipulated facts indicate a 2009 case filed in Weld County by Summit against the Debtor and his companies in November 2009. Therefore, at least at the time of the Laskin Transfer by KLC to J. Kendall, he knew of pending or imminent litigation by Summit. Therefore, this factor weighs in favor of finding actual fraud with respect to the Laskin Transfer.

> 5. *Whether the Transfers Were of Substantially All of the Debtor's Assets*

The Trustee alleges the Debtor had very few assets remaining after the House Transfer, and even fewer after the First Cash Transfer and the Laskin Transfer. It is undisputed the House Transfer, the First Cash Transfer and the Laskin Transfer reduced the Debtor's assets. It is also undisputed the value of the Debtor's interest in KPC fell precipitously following the closure of the company. However, after these transfers, the Debtor continued to own KLC, which in turn owned the land occupied by KPC valued at approximately $2.6 million by the Trustee's appraiser, Harold Sommers. Therefore, although the House Transfer, the First Cash Transfer and the Laskin Transfer significantly diminished the Debtor's assets, the Court cannot find they represented a transfer of substantially all of the Debtor's assets, and this factor weighs against finding actual fraud.

> 6. *Whether the Debtor Absconded*

There is no evidence the Debtor absconded. He continued to live and work in Greeley, Colorado after the transfers were made. Therefore, this factor weighs against finding actual fraud.

> 7. *Whether There Was Removal or Concealment of the Assets Transferred*

The assets were not removed or concealed. The House and the cash were simply transferred. Therefore, this factor is not applicable to the subject transfers.

> 8. *Whether The Debtor Received Reasonably Equivalent Value in Exchange for the Transfers*

The Debtor admitted the House Transfer was for no consideration, so reasonably equivalent value could not have been exchanged.[57] Moreover, he admits he received no consideration for the First Cash Transfer, and received a promissory note upon which no payments have been made in exchange for the Laskin Transfer. Therefore, the Court finds the Debtor did not receive reasonably equivalent value in exchange for any of the transfers, and this factor weighs in favor of finding actual fraud.

---

[57] *See, e.g.*, Defendants' Exhibit A, a financial statement produced by the Debtor, referring to the real estate transfer for which the amount paid was $-0-, and Defendants' Exhibit F, another financial statement for the Debtor indicating the estimated value of the house was $2,000,000.

### 9. *Whether the Debtor Was Insolvent at the Time of the Transfers*

The Bankruptcy Code defines "insolvent" as:

a financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation, exclusive of (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title.[58]

The Trustee's expert witness, Peter Schulman, testified the Debtor was insolvent as of the time of the House Transfer in October 2008 because his debts exceeded his assets by approximately $2.8 million. In addition, Mr. Schulman opined the Debtor continued to operate KPC's business with unreasonably small capital after October 2008, and could not pay his debts as they became due. Mr. Schulman focused his solvency analysis on the values of KPC and KLC, because those were the Debtor's largest assets following the House Transfer.

Specifically, Mr. Schulman noted KPC had stable gross profits of between 25% and 28% before the company purchased a Heidelberg printer in 2005. However, due at least in part to defects in the printer, gross profits declined significantly between 2006 and 2008, to between 2.4% and 8%. In addition, Mr. Schulman noted the company's EBIT (earnings before interest and taxes), a reflection of a company's earning power on a debt-free basis, declined to negative $964,000 in 2008. He explained a negative EBIT, like KPC's, indicates a company is significantly over-leveraged and could not make a profit even if it had no debt. Further, Mr. Schulman noted expanding the items removed to create an EBITDA (earnings before interest, taxes, depreciation and amortization), showed an equally bleak outlook for KPC in 2008.[59]

Mr. Schulman stated he used an asset approach, as opposed to an income approach or a market approach, to value KPC, because KPC had no viable forward-looking information. Since the income approach and the market approach are both forward-looking, the asset approach became the only appropriate valuation in his opinion.[60] He rejected the Debtor's $3.1 million estimate of the value of the real estate

---

[58] Section § 101(32)(A). This definition is known as the "balance sheet" test for insolvency. The other test for insolvency, not paying debts as they become due, is a lower standard and is known as the equity test for insolvency. See *Thaler v. Estate of Arbore (In re Poseidon Pool & Spa Recreational*, Inc.), 433 B.R. 271, 280 (Bankr. E.D. N.Y. 2010)

[59] *See* Trustee's Exhibits 92, 93, 96 and 99.

[60] Mr. Schulman explained the concept of the income approach to value is based on an assumption that ownership interest is equal to the sum of the present value of expected future returns, that is, it is a forecast of future cash flows discounted back to present value. The market approach is forward-looking based on a prospective sales price using recent actual sales of comparable companies.

on which KPC operated, instead choosing to use the $2.6 million real property appraisal of Harold Sommers.[61] In addition, he used the equipment appraisal submitted by William Dickensheet. At trial, Mr. Dickensheet testified the auction value of KPC's equipment was $1.3 million.[62]

Mr. Schulman conceded he did not consider the $335,239.54 in the Debtor's Genworth Financial Wealth Management Account[63] nor the funds in the Debtor's John Hancock Financial account in reaching his opinion of solvency.[64] Moreover, he noted he did not discount the Debtor's personal guaranties of the New Frontier loans, because, although he admitted KPC had assets to sell to satisfy the debts in part, he believed it was likely KPC would default on the loans and the Debtor would become personally liable.

By contrast, the Debtor's expert, John Cothran, valued KPC's printing equipment at approximately $8.8 million.[65] He believed the Heidelberg press was the most valuable piece of equipment, and estimated it to be worth $2.46 million if it was in good operating order. The Court finds this expert testimony less reliable than the testimony of Mr. Schulman for the following reasons. First, Mr. Dickensheet testified the Heidelberg press sold for between $700,000 and $800,000 at public auction, which provides a better indication of its value. Second, the Debtor admitted the ongoing difficulties with the operation of the press, and Mr. Dickensheet testified he accounted for these difficulties in valuing the press. Third, although the Debtor's personal financial statement of February 16, 2009 valued KPC at $9.7 million,[66] the KPC balance sheet of September 30, 3008 reflected the printing equipment and other equipment, furniture, fixtures, and improvements of KPC at approximately $7.7 million, and reduced that value by accumulated depreciation to $2,332,247.26. In particular, the value of the

---

[61] *See* Trustee's Exhibit 39. At trial, Mr. Sommers explained he performed both an income approach and a sales comparison approach for the printing business real estate, and concluded the value for both the land and the building was $2.6 million. He acknowledged he appraised the property both as of October, 2008 and February, 2009, and arrived at the same value because he found economic conditions had not changed in the four months.

[62] *See* Trustee's Exhibit 38.

[63] *See* Defendants' Exhibit Q

[64] *See* Trustee's Exhibit 5, the Debtor's Schedules and Statement of Financial Affairs, reflecting $71,535.82 in the John Hancock account. The Court notes, however, this figure was stated to be as of June 23, 2010, long after the transfers in question. However, even with the addition of the approximately $400,000 represented by these deleted items, Mr. Schulman's evaluation would still show the Debtor's liabilities exceeded his assets by approximately $2.4 million.

[65] *See* Defendants' Exhibit G.

[66] *See* Defendants' Exhibit F, Trustee's Exhibit 35.

printing equipment was reduced by accumulated depreciation from $7,094,798.68 to $2,146,584.73 ($7,094,798.68 minus $4,948,213.95).[67]

Moreover, although the Debtor testified he believed both he and KPC would be able to repay the New Frontier loans, he acknowledged KPC's revenues dropped significantly in February 2009.[68] The Court notes the financial statement of September 30, 2008, shows KPC had current assets of $1,090,801.07, and total assets of $3,423,048.33. The statement does not give a figure for total liabilities, but indicates current liabilities of $5,719,510.49, and negative equity of $2,296,562.16.[69]

For the above reasons, based on its consideration of the testimonial evidence presented by the Trustee and the Debtor, and of the exhibits presented by the parties, the Court adopts the opinion of Mr. Schulman, and finds the Debtor was insolvent at or about the time of the House Transfer because his liabilities exceeded his assets by at least $2.4 million. In addition, the Debtor's testimony indicates he continued to be insolvent at the time of the First Cash Transfer and the Laskin Transfer, due to the decline and ultimate closure of KPC.

 10. *The Proximity in Time of the Transfers to the Incurrence of Substantial Debt*

The Debtor and the Trustee agree the Debtor sought to refinance the New Frontier loans in February 2009. However, the Debtor did not take on substantial new debt at the times of the transfers.[70] Rather, the Debtor stated he wanted to refinance to facilitate a sale of KPC to Pioneer Printing, which never occurred. Any new debt the Debtor would have incurred would have been the contingent debt based on his guaranties of the New Frontier loans if and when KPC defaulted. As he admitted KPC was failing as of mid-November 2009, and in fact closed in that month, the possibility of incurring additional personal debt based on the guaranties weighs at least somewhat in favor of finding actual fraud as to the Laskin Transfer made in November 2009.

---

[67] *See* Defendants' Exhibit B.

[68] *See* Trustee's Exhibit 47.

[69] *See* Defendants' Exhibit B, financial statement dated September 30, 2008, showing current assets of $1,090,801 and current liabilities of $3,719,610.

[70] *See* Defendants' Exhibit C, loan commitment from New Frontier in March, 2009.

> 11. *Whether There Was a Transfer of Substantial Business Assets to a Lienor Followed by a Subsequent Transfer of Such Assets to an Insider of the Debtor*

The refinancing of the New Frontier loans occurred after the House Transfer and before the First Cash Transfer and the Laskin Transfer. In addition, the assets transferred were not to New Frontier or another lienor, but directly to an insider, J. Kendall. Therefore, this factor is not applicable to the subject transfers.

> 12. *Conclusion on Actual Fraud Claim*

Based on the findings with respect to the above factors, the Court finds the Trustee has demonstrated actual fraud under both § 548(a)(1)(A) and COLO. REV. STAT. § 38-8-105. Specifically, the Trustee has shown the presence, at least in part, of seven out of the eleven possible "badges" of fraud. Most importantly, he has shown the subject transfers were made to insiders at a time when the Debtor was insolvent and his business was failing. Thus, the Court finds the Trustee is entitled to recover the House Transfer, the First Cash Transfer and the Laskin Transfer under §§ 548(a)(1)(A) and 544(b).

## B.   Constructive Fraud

Unlike actual fraud, "constructive fraud" does not require a debtor to act with actual intent to defraud the creditors before a transfer can be avoided. A showing of constructive fraud operates to avoid transfers motivated by generosity, rather than fraud, reflecting the policy that an insolvent should be "just to his creditors before he is generous to others."[71] To avoid a transfer as "constructive fraud" under § 548(a)(1)(B), the Trustee must show: 1) a transfer of the Debtor's property occurred within two years of the filing of the bankruptcy petition; 2) the Debtor received less than "reasonably equivalent value in exchange for the transfer"; and 3) the transfer occurred either while the Debtor was insolvent, or the Debtor was rendered insolvent as a result of the transfer, whether the Debtor was engaged in business or about to engage in business for which his remaining property was unreasonably small capital, or whether the Debtor intended to incur debts beyond his ability to pay as they matured.[72]

---

[71] *Morris v. Midway Southern Baptist Church ( In re Newman)*, 203 B.R. 468, 473 (D. Kan.1996).

[72] Section § 548 (a)(1)(B)(ii)(I)–(III). Here, because the transfers at issue were not made with respect to an employment contract, § 548(a)(1)(B)(ii)(IV) does not apply. *See TCIC, Inc. v. Thalheimer (In re TCIC, Inc.), 428 B.R. 103, 115-116 (Bankr. D. Del. 2010).* With respect to the elements of constructive fraudulent transfer, *see also In re Garcia,* 465 B.R. 181, 190-191 (Bankr. D. Idaho 2011).

Similarly, pursuant to Colorado law:

A creditor may show, under sections 38–8–105(1)(b)(I) and (II), or –106, that a transfer was constructively fraudulent. *See In re Unglaub*, 332 B.R. 303, 315 (Bankr. N.D. Il.2005). The prohibition of constructive fraud "operates to avoid transfers motivated by generosity, rather than fraud, reflecting the policy that an insolvent [an entity or a person] should be 'just to his creditors before he is generous to others.' " *In re Bloch*, 207 B.R. 944, 947 (D. Colo.1997) (quoting *In re Newman*, 203 B.R. 468, 473 (D. Kan.1996) ).
A creditor may prove the general theory of constructive fraud in three specific ways under CUFTA. See Prefatory Note, Uniform Fraudulent Transfer Act, § 38–8–101. Two of these ways are found in section 38–8–105(1)(b)(I) and (II), which pertain to creditors' claims that arise before or after the transfer. A creditor relying on these versions of constructive fraud must show that the debtor did not receive "reasonably equivalent value" for the transfer, and either that, in subsection (b)(I) the debtor's remaining assets were "unreasonably small" in light of the debtor's business; or in subsection (b)(II) the debtor "intended to incur, or believed or reasonably should have believed that he would incur" debts beyond the debtor's ability to pay them as they became due. § 38–8–105(1)(b)(I), (II).

The variety of constructive fraud found in section 38–8–106(1) only applies to creditors whose claims existed before the transfer. Under that statute, a creditor may show that the debtor did not receive reasonably equivalent value for the transfer and that the transfer rendered the debtor insolvent.[73]

As noted above, the parties agreed the House Transfer and the First Cash Transfer were made for no consideration, so no reasonably equivalent value could have been received. Also as determined above, no reasonably equivalent value has been received as to the Laskin Transfer because no payments have been made on the promissory note, and J. Kendall's testimony as to the status of her business does not support a finding Laskin would be able to repay such a note.

Accordingly, the main issue regarding constructive fraud is whether the Debtor was insolvent or rendered insolvent by the subject transfers, whether he was engaged in business or about to engage in business for which his remaining property was unreasonably small capital, or whether he intended to incur debts beyond his ability to pay as they matured.

---

[73] *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 529-30 (Colo. App. 2010).

### 1. Was the Debtor Insolvent?

For the reasons set forth under subsection A.9., *supra*, discussing actual fraud, the Court finds the Debtor was insolvent at the time of the House Transfer, and remained insolvent at the time of the First Cash Transfer and the Laskin Transfer.

### 2. Was the Debtor engaged in business or a transaction, or was about to engage in business or a transaction, for which his remaining property was an unreasonably small capital?

Because the Debtor was engaged in business for which his current liabilities exceeded his current assets by over $4 million, and because his total current liabilities exceeded his total assets by over $2 million, he was engaged, at the time of the House Transfer, in a business for which his remaining property was unreasonably small capital.

### 3. Did the Debtor incur, or believe he would incur, debts beyond his ability to pay as such debts matured?

While the Court received no direct testimony as to the Debtor's belief, other than his conclusory statement he believed KPC could make the payments on the New Frontier loans, the fact he submitted a Statement of Assets, Liabilities, and Equity which clearly demonstrated KPC did not have that ability demonstrates he knew or should have known he would incur debts beyond KPC's ability to pay.[74] Because the Debtor personally guaranteed the New Frontier loans, he knew or should have known he would be facing, upon KPC's default, debts well in excess of $5 million at a time when his personal net worth was declining due to the decline in value of KPC, and would be virtually impossible for him to pay, even with his represented total net worth of $6,759,675 as of February 16, 2009.[75]

### 4. Conclusion on Constructive Fraud Claim

Based upon the above, the Court finds the Trustee has demonstrated constructive fraud under both § 548(a)(1)(B) and COLO. REV. STAT. § 38-8-106. Most importantly, he has shown the subject transfers were made to insiders at a time when the Debtor was insolvent and his business was failing. Thus, the Court finds the Trustee is entitled to recover the House Transfer, the First Cash Transfer and the Laskin Transfer under §§ 548(a)(1)(B) and 544(b).

---

[74] *See* Defendants' Exhibit B,

[75] *See* Defendants' Exhibit F and Trustee's Exhibit 35.

**C.    Recovery from J. Kendall, Laskin and the Trust**

Section 550 provides in relevant part:

(a) Except as otherwise provided n this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recovery, for the benefit of the estate, the property transferred, or, of the court so orders, the value of such property, from–

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

Because J. Kendall was the initial transferee of the House Transfer and the First Cash Transfer, the Trustee is entitled to recover the House Transfer and value of the First Cash Transfer from her.  Because J. Kendall was the beneficiary of the Laskin Transfer, the Trustee may recover the value of the Laskin Transfer from J. Kendall or from Laskin.  In addition, the Trust was the immediate transferee of J. Kendall and Laskin of the House Transfer, the First Cash Transfer and the Laskin Transfer, and therefore the Trustee may also recover the House Transfer and the value of the First Cash Transfer and the Laskin Transfer from the Trust.  Pursuant to § 550(d), the Trustee is entitled to only a single satisfaction for any recovery.

## CONCLUSION

For the reasons stated above,

IT IS ORDERED the House Transfer, the First Cash Transfer and the Laskin Transfer are hereby avoided under 11 U.S.C. § 548(a)(1)(A) and (B), 11 U.S.C. § 544, and COLO. REV. STAT. §§ 38-8-105 and 106.

IT IS FURTHER ORDERED pursuant to 11 U.S.C. § 550(a), the Trustee may pursue recovery against J. Kendall, Laskin, and/or the Trust, within the limitations imposed by 11 U.S.C. § 550(d).

IT IS FURTHER ORDERED each party shall bear its own fees and costs.

Dated August 6, 2012                              BY THE COURT:

Michael E. Romero
United States Bankruptcy Judge